The case on the docket today is 2012-1507, Apple v. Samsung. Mr. Quinn, whenever you're ready. Thank you, Your Honors. My name is John Quinn, and with the permission of the Court, I propose to address three points. First, under this Court's teaching in the case between these parties earlier this year, to obtain a preliminary injunction, Apple was required to make a clear showing of substantial and immediate irreparable harm if a preliminary injunction were to issue. Whereas here, irreparable harm is predicated on lost market share, that lost market share must be substantial. That, Apple did not prove in the District Court below. To the contrary, the record evidence which caps the lost market share at 0.5% refutes any such findings. But this case, unlike some of the others, also includes the District Court's findings with respect to downstream or whatever term it is people use in terms of other products. So doesn't that enhance the importance of the 0.5% at the end of the day? I don't think so, Your Honor. What we're talking about there are still sales, potential downstream sales, to a relatively small number of people. The theory was that there are network effects, follow-on sales. If somebody buys an iPhone, they will buy applications, they will buy chargers, they might buy iMacs. So to the extent that that's correct, that could significantly enhance that number of 0.5%, right? I mean, that enhances the impact. It does enhance the impact, I agree with that. But we're still talking about purchases of related products by a very small number of people. We're talking about 5.5% of the market. And I suggest, Your Honors, really there is... You said 0.5%, not 5.5. 0.5% of the market. So we're talking about potential follow-on effects, purchases by a relatively very small number of people. And I think that... Counselor, what about some of the evidence on the record about future sales that Samsung is expected to make? Your Honor, Samsung's projections... I mean, there is evidence on the record that Samsung hoped that the Nexus would be a hero project. I think this comes under the category of best-laid plans of mice and men. The record evidence is that this product was not very successful. It only captured 0.5% of the market. And if anything, its sales were declined. Well, but Samsung's evidence is they expect to sell, what, a million units in the next year or two. And they think the next 12 to 24 months are absolutely critical for first-time phone purchasers. Why isn't that providing the lost market share? Yes, Judge Moran. But the 0.5% number only goes to, what, two different quarters, or one quarter of sales in the past. Exactly. But there is no reason to think that that number is going to go up. No reason to think it's going to go up. Samsung's evidence is that they anticipate it to go up. Why can't Apple rely on that as evidence? I mean, this is a P.I. Yes, they projected sales in the first year of some 900,000-plus units. But again, we're talking about a market where, and I think perhaps the district court may have gotten distracted by some of these large numbers. We're talking about a market where the total sales in exceed over 100 million units to the, I think, the top 10 vendors. This is still a very, very small percentage. And the evidence in the record is that smartphone sales, Nexus sales, as iPhone sales, went down after the introduction of the Nexus phones. So there is simply no evidence in the record to support. Sure, Samsung had plans, thought this would be a hero project or a product, and that they would capture larger market share. There is simply no evidence in the record to support the notion that they did or that it would. If you have an increasing trend in sales over a period of two quarters, and that's the only data that we're looking at, and you have an increase in sales, and that increase represents over just two quarters, 0.5% gain in market share, isn't that evidence of an increasing growth in market share? It might be, Your Honor, but actually the record evidence here is that actually Nexus sales went down from the fourth quarter of 2011 to the first quarter of this year. And they sold at a higher rate in the fourth quarter than they did in the first quarter. So the evidence, the only evidence that we have before us now is that this is a product which at most, at most, captured 0.5% of the market. No, in that one quarter, 0.5%, but the evidence of record suggests that the sales are going up dramatically after that. So what, I don't think you can say at most 0.5%, and Mr. Quinn, what would be a percentage that would amount to a substantial market share? I'll just say, Your Honor, I'm not aware of any evidence in the record that actually sales went up after the first quarter of this year. Projections all indicate sales are going to go up. They had projections of about 900,000-something. If you multiply that out and compare it to the full market size, which is in the record, it comes to somewhere between 0.5% and 1%. However you look at it, it is a minuscule amount. Well, what is a substantial market share? Because the record is also replete with quotations about how this is a two-horse market between Samsung and Apple as the two leading offers, the two people most likely to compete for the new phone purchases. So if 0.5%, if Samsung's share is insignificant, then what is a substantial market share? It would jeopardize Apple. This particular phone, I'm not saying that Samsung as a whole that its share is insignificant, but this particular phone, which we're addressing here, is insignificant. In terms of what's the appropriate number for a market share that would constitute irreparable harm, I don't think that it's possible to lay out any one general rule of general application. I would suggest the following, that the court should look at effects that are similar to those that were recognized in other cases where this court has found irreparable harm. We've collected those cases, I think on pages 6 to 7 of our reply brief, cases where the court said, yes, it's irreparable harm, where a product has been rendered obsolete, as in the i4i case. Or there is evidence of price erosion. Or there is evidence you've had to fundamentally change a business plan. We have nothing like that here, Your Honors. This is a case, and I submit, neither party has cited to this court a case where pure loss of market share constituted a finding of irreparable harm. In every case, there is something else, one of those other factors. And here we are talking about the most valuable, arguably most successful company in the world. Record evidence is they capture over 40% of the smartphone market, 75% of the industry profits. There is simply nothing in the record here, whether you count downstream effects, the small number of Nexus purchasers, that would support any finding of irreparable harm. Can I turn, before your time runs out, can I turn to the other question, the other Nexus, but not Galaxy Nexus? Yes, the causation issue. Causation. Yes. And I'm sure you can appreciate that they've got a new product. It's very difficult to be able to show any results in terms of driving consumer demand. And we've got an industry here and products here, whether it's Siri or Galaxy Nexus. All of this stuff is relatively new, so it's kind of difficult to develop a track record through data to support positions. So what are we to do with that? Well, first, it's not new. The record evidence is that this quick search box feature has actually been on Samsung telephones since July of 2010. That's the Young-Soo Lee declaration. The district court cited that fact and discussed that declaration in the opinion at A93. Nobody noticed this feature. Nobody paid any attention to it. There just isn't any evidence at all that this feature, when it came out until this lawsuit was brought, that people were paying any attention to the quick box feature. But the claim 6 represents a difference or an improvement on the quick box feature, right? Well, the unified search, the ability, what's at issue here, the ability to search simultaneously across browser and people was in existence for some time. They got their patent issued in December of last year. But it had been out on Samsung phones for some time before that. But, I mean, is it possible to prove causation? As this court said, I think it has to be. We're talking about, this is a company that, you know, they are students of the market. They've shown they have the ability to do surveys. I know there was an issue before this. They don't need that, do they? I mean, our cases allow for circumstantial evidence. Of course, and there's lots of ways to prove causation. It's one of the most, you know, elementary basic elements of most types of claims. They don't have to prove customer survey evidence, but they could. It's possible to do that. They have the wherewithal to do that. It's possible to look at marketing and advertising materials. What's being promoted as the nifty new feature by Samsung? I mean, if Samsung were running ads saying, you can search people in browser with one quick search in a quick search box, that might be some evidence that this drives sales. There was a complete default on that. What did the district court cite to? The district court cited to three things. First, an excerpt from the Android developer's guide. Folks, your honors, that is not something that's directed to consumers. This is for technical manual for people who write software for Android programs. And what that says is that search is a core feature and it describes the quick search box. That is not evidence of why people bought Galaxy Nexus. What if the evidence was all about Siri, but that Siri had no feature other than exactly what was claimed? That Siri was nothing but unified search. She didn't have the great little voice. She doesn't call you whatever you ask her to call you. None of these are weird things. Only the unified search. And then they presented the exact same evidence they did about customer satisfaction and desire to purchase on the basis of Siri. Would that be enough? I would submit no is the answer to that. That would be perhaps a stronger case because that would at least deal with the issue about... Why wouldn't that be enough? Because the issue is what drove purchasers of Nexus, not why did people buy iPhones. That's a fundamental error that the district court... Sir, why can't that be circumstantial evidence? If Siri was only a unified search and nothing more, and the evidence that Apple has shows that this is why people buy iPhones, because they want the unified search, the unified search is just the bee's knees, and why wouldn't that be enough circumstantial evidence to establish the same would be true for your case? I think that might be some evidence, Your Honor. I think you're afraid to occasionally agree with something a judge asks you. No, that might well be some evidence if that were the case. That may well be some evidence. Well, I mean, we're talking about... I could spin out other... What other things to fill in the hypothetical? What else does Nexus have? Do people know that Nexus also has this feature? There is no evidence that people knew that Nexus had this feature. What was the total evidence on that? You had the Android developer's guide, not for consumers, for specialists who write in software. You had an excerpt from a Google mobile blog from October of 2009. Before that, Nexus even goes into the market. Can I, just before your time runs out again, just to... The key sentence, for me at least, in the district court's opinion with regard to the Nexus, seems to be the sentence on A85 where she says, Apple has shown that the 604 patented feature is core to Siri's functionality and is thus a but-for driver of demand for Siri. Do you think that statement is misplaced as a legal matter, or is it just that the evidence wasn't sufficient? I think that statement is not supported by the evidence because if you look at the evidence, including Mr. Rangel, their 30B6 witness, about what drives purchases of Siri, he says it humanizes the smartphone. That you have the ability, this voice interaction feature, that it humanizes the smartphone, you have this virtual personal assistant. That is, I submit, that's what drove the purchases of Siri. But again, I don't think that's the question, with respect, that we should be focusing on. We should be focusing on why people bought Nexus. When you look at the concurrence, and it is a concurrence in the Apple One case, this is Judge O'Malley's concurrence, and she says that the existence of a two-player market may well serve as substantive ground for grand injunction. It creates a nexus and an infringing sale amounts to a law sale for the patentee. And then she goes on and says she's interpreting the majority holding. She's concurring with it. But she says when you have only two players in the marketplace, you don't have to go down as deep into consumer demand analysis. It's enough to say if you have lost sales on one column, you're going to have, you can infer that there's a gain sales on the other column. Don't we have a two-player market here, and shouldn't we be looking at this analysis from this perspective? With respect, no we don't. There's still Motorola. There's still Nokia. There are still research in motion. There are still, there are over 300 manufacturers of Android phones. And we have evidence as to why people buy Android phones like Nexus that was in the record, which the district court disregarded. Apple's own survey as to why people buy Nexus and Android phones is, People want Androids. People want, they just like the ice cream sandwich, or they like the Android operating system. It's a lower price. There are various factors. So you don't agree this is a two-horse market? I don't agree that it is. I mean I agree these are the two dominant companies, and obviously there are Samsung documents that say this is increasingly becoming a, So it's a two-horse and several pony market. Well, but let's look at it. You have Apple, which is dominant. You have Samsung. The graphs show us that you have over a period of time, several years, your sales are increasing. You're the only competitor, true competitor against Apple. Why wouldn't we look at this as a two-player market? Because the evidence is, the record evidence is, that it's not so much a decision between buying a Samsung phone and an iPhone, but buying an iPhone or an Android phone. And that 0.5%, which I said caps the lost market share, it's certain that Apple would not have captured that 0.5%, that full 0.5%. Can you, I'm sorry, were you not there? I'm going to say much of that people who prefer Android for the reasons that Apple identified in their surveys would have purchased some other Android phone. In other words, your evidence is that the Nexus, I think you said, is only one out of 315 available Android phones. I think that's what they said. I think they, yes, yes. Would you mind turning to your claim construction argument on each heuristic module? Yes. I would like to ask you, do I have to conclude that there is a disclaimer in order to go the way that you want to go on claim construction? In terms of the Androle prosecution history. Yes, do I have to conclude that that amounts to a disclaimer? No, I don't think you have to. Your Honor, I do not believe you have to conclude that. Do you think it is? I'm sorry? Do you think it is a disclaimer? We think that Apple definitely went out of their way to distinguish Androle on the ground that, as they told the Patent Office, unlike the 604 patents, Androle does not teach searching with different heuristic algorithms in each field. So, yes, we do believe that that is a disclaimer. But, again, we only have to raise a substantial question with respect to the issue of infringement here and on this claim construction. And I think that Your Honors can look at the plain language, each meaning each. The language here is different in the Race QNet, where the language in the claim was each of a plurality of fields. If that were the language here, I wouldn't be here making this argument. But it's quite a bit different here. If you read the language here, it's clear that each heuristic module must have a predetermined different heuristic algorithm. It's different. Do you have that clear statement in the specification where they stated that the heuristic of each plug-in module is different? I know that the general rule is that you don't look at specifications, citations of particular embodiments and specifications to limit claims. But here, that is the only place where they squarely address that issue. And if you go to the claim language, they rely on associated heuristic. Of course, that's on all fours with different heuristics. Each can require a different heuristic, and each module still has an associated heuristic. Your opponent argues that the claim language, the use of the word wherein, makes a big difference as to what the word each modifies. What's your response to that? It comes back to a plain language. I don't think wherein helps their interpretation on that, with all respect. If you track the language, I think each means each is different. The specification says that. You have the prosecution history where they went out of their way twice to distinguish Andreoli on this ground. And we have the decisions, the SCORVETS decision and the Board of Regents decision, both of which I submit support our interpretation. This, by the way, is a pure question of law. And I submit we at a minimum have raised a substantial question, which is all we need to do at this point in order to defeat the preliminary injunction. Okay. I think we have your argument, Mr. Quinn. You've gone three minutes beyond your allotted time. What I think we'll do is we'll restore you three minutes of your rebuttal time, and that puts you six minutes ahead of the clock. So if Mr. Perry needs it, we'll add six minutes to his time. Don't feel compelled to use the entire amount. Thank you, Your Honors. You're welcome. Thank you. Thank you, Your Honor. May it please the Court. This is a two-horse market. This is head-to-head competition. Mr. Quinn is arguing not only with the evidence but with the district court's factual findings. Well, there's no dispute that the market share is 0.5 percent, is there? Your Honor, for two quarters. Remember, the Galaxy Nexus started at a standing start, so it was 0 on December 15th of 2011 when they put out this market. This one phone sold gangbusters. It was the top-selling phone at Verizon. It was the top-selling phone at Sprint. It came out of the box and captured that in two quarters, and they're projecting what is 0.5 percent? Let me back up on that. That's the population of Idaho is 0.5 percent of the United States. Mr. Quinn's argument is you can just ignore Idaho, Your Honor. Well, everything is relative in this case. It is indeed. I'm sure you know. So Idaho is only big or small depending on what you compare it to. So the 0.5 percent. What is your view? Is there some floor on the percent of market share that would be sufficient to establish? I mean, the standard is substantial market share. It's substantial market share, Your Honor. Is there some sort of floor based on our cases that have discussed this? There's no numerical floor, Your Honor, and it's important to note that that 0.5 percent is of all phone sales. What we have here is a two-phone market, the iPhone 4S and the Galaxy Nexus. That's what their documents say. A2693 is a good example, Your Honor. So all these other phones on the market are irrelevant? They are not full-featured smartphones. This is their top-of-the-line gold-plated Cadillac phone that they trotted out specifically to compete with the iPhone 4S. This is the first phone in Samsung's history that has interoperability among the platform. You've read a lot about platform stickiness and so forth. But the way phones go, it's already probably been superseded by something else. The Galaxy S3 is now on the market, Your Honor, and that points up an issue as to this injunction. This market moves fast, and Samsung here wants to get to that trial in 2014. And between now and then, 100 million people are going to buy their first smartphone. They already own a phone, but they're going to buy their first smartphone. Why are they going to buy the smartphones? And I agree. You look at the data, and the data show a very sharp increase at the end of 2011 and the beginning of this year with the introduction of the Nexus. There's a sharp increase. But why is there a sharp increase? Why are people buying the Nexus? Your Honor, it is the full-featured phone that can compete on all fours of the iPhone 4S. That's what their marketing documents design it. This is the beat Apple strategy. They finally came up with a product that has all the features. Is there any evidence in the record that shows that they're buying the Nexus because of the infringing feature? There is, Your Honor. There's three pieces of evidence, and I'd like to focus on that. First is the Siri evidence, and this is important circumstantial evidence. And Judge Moore, this goes to your question. You asked Mr. Quinn, what if the evidence showed that Siri was just unified search and people were buying it for that reason? That's not only what the evidence shows. That's what the district court found at page A83, citing Dr. Polish's deposition, which appears in the record at A909, where he testified, set aside speech recognition. Siri, what matters to consumers is the… But how do you set aside speech recognition? That's what Siri is all about. It's not, Your Honor, because speech recognition only gets you so far. If it doesn't return the results that you want, people don't care. And Dr. Polish testified to this, and there's a finding of fact to this effect, that results matter. People care about search because of the results. 30% of the people surveyed… Are you referring to the deposition that she cited? Yes, Your Honor, on page A83. Her citation is A83. The actual deposition is at A909. But if you look at 1285 and 1297, people understand how the district court failed to address the evidence that you provided. It seems like the only direct evidence in the record of any kind that goes to why people are buying the Galaxy Nexus phone suggests that it's a whole bunch of reasons, none of which are unified search. Your Honor, thank you for asking. The rest of it is tangential evidence. If the court would look at A1297, it's the reasons that people choose an Android phone over an Apple phone. They are the differences between the two phones. These two phones both have unified search, so that wouldn't ever appear on this list. It's not a surprise that those charts are there.  The title of that chart, A1297, why do people choose… Just for clarification, you didn't invent… 604 isn't claiming a unified search. It's claiming a particular unified search through one interface to search locally and through the network. So just to that point, I mean, the district court, one of the two sentences that I read is kind of being the be-all and end-all findings for her. She says Samsung does not contest that Siri feature uses the claimed unified search features in the 604 pattern. But unified search wasn't invented by them. How could that be a driving force? There is no evidence to the record that there is any non-infringing way to do unified search in this sense, that is, put in one input, have it go out to multiple search areas, and return an answer using heuristics. There is no other way to do that. This is a really cool invention that has really revolutionized searching. Does the Apple 4 have a unified search capability? No, Your Honor. The Apple 4 search function indexes the information locally on the device. It doesn't use the heuristic methodology the way that Siri does. Can I go back to substantial market? I mean, Bosch, which you rely heavily on, which the district court relied heavily on, is considerably different in this case with respect to market share, right? I mean, at least, I don't have the numbers in front of me, but clearly they talked about the accused infringer, it was a permanent injunction, right? The infringer having already obtained the Walmart contract, which in and of itself consumed a substantial share of the market. So doesn't that make it a lot different? It's not, Your Honor. And I need to come back to this head-to-head competition. If you look at the Samsung documents, the Galaxy Nexus is set up against the 4S. That's the only competition. That's A2693. And their expert at A1285 testifies that if the Galaxy Nexus is not available, at least some customers are going to buy the Apple iPhone 4S. And this .5%, their projections, and these weren't just some random marketing projections. These are what came into the district court and asked for a bond to protect them from this injunction. They said from June of 2011 to July of 2012, we are going to sell a million units. Okay, but why isn't that, leaving aside the downstream effect, why isn't that classically, whether it's a million or 20 million, what you can calculate in damages? Where is the irreparable harm in that? Your Honor, it is the downstream effect because it's not just a million units of the phone, but it's a million customers that they represent. And in this market, the evidence was absolutely undisputed that once a customer selects a platform, a significant number of them, 75%, 80% stay on that platform for life. So if those customers are stolen away from Apple by an infringing device and moved to the Android platform, Apple may never get them back, which means not only do we not sell the iPhone 4S today, but tomorrow we don't sell an iPod, an iPad, an iMac, the iTunes songs, apps. Well, I'm sure you can get a damages expert that can calculate all of that. As you well know, in these patent cases, determining damages is no small matter. You get ranges of $1 to $100 million. So damages are disputed ad nauseum in these cases. So why is this not a classic example of what happens in a patent case? And we'll all decide how much you're owed if you win based on the damages phase of the trial. Well, first, Your Honor, Judge Koh looked at that and found that these would be incalculable. And from the district court's perspective, that's a finding of fact. Second, these defendants would come in if we tried to put in that damage calculation and say that's all speculative. Once you get past the first sale, you'll never know what the person's going to know. We know from market research that there is platform stickiness, but they will buy a number of things. Well, yeah, you have your market research. That's right. That's exactly what you would say in the damages phase. That's right. I'm sure you'd have very compelling evidence to show market stickiness. And Samsung made that argument to the district court, and the district court said no. Those are the kinds of harms, downstream sales, that are not presently calculable. They're not remediable in damages because we'll never know. There's also one other important point which is totally incalculable, which is the network effect. Again, an undisputed finding of fact by the district court. In this kind of environment, the number of people on a platform matters because it drives development of future applications and so forth. And once you drop below a certain number, the platform is going to wither and die. And the network effect, that is the ability to keep enough people on a platform to make it a thriving environment. Okay, well, I'm pretty sure the Galaxy Nexus isn't going to make Apple iPhones wither and die, such that their entire network goes under. And I don't think I saw that Judge Koh make any findings that would support that argument. No, Your Honor, the point is the more people in the network, the stronger the network itself. So every customer they take away is not just a sale of an iPhone, not just a sale of downstream products, but a diminution of the network. And she may express findings on this as value to Apple. Do you have the citation? Yes, Your Honor. Is this in her original one? This is in her original order. So how many iPhones are sold in a year? It is page A76, Your Honor. How many iPhones are sold in a year? Of all? How many iPhones are sold in a year? Well, there's multiple models of iPhones, that's why I'm clarifying. Some 35 million iPhones. 35 million iPhones sold in a year. The Galaxy Nexus, the largest estimate is that it stands to sell a million phones over the next year. That's correct, Your Honor. So one-thirty-fifth, even if we're doing only a head-to-head comparison between iPhones and the Galaxy Nexus. Well, that's why I asked the first question. The head-to-head comparison is the Galaxy Nexus versus the iPhone 4S, the top-of-the-line iPhone. There are smaller, less full-featured iPhones, just there are less full-featured Galaxy phones. It's not the same company-to-company, but there are product lines here. Okay, well then what is your evidence regarding the number of iPhone 4Ss that are sold? I don't know the answer to that, but I do believe there is a citation in the confidential part of the record, Your Honor, that I can't... Well, I mean, but you keep harping on the 0.5% number not being right, okay? And that's already out there, this 0.5% number. Yes, Your Honor. So then the question is, so what is the number? If you're telling me the number 0.5%... No, no, 0.5% is not the accurate number, because that's looking at one phone as compared to the entire market. And you're telling me, no, I should be looking at one phone compared to one phone. So what is the percentage? It's roughly 25%, Your Honor. And the actual data is in the appendix, as I said. And, by the way, I don't... 0.5%, a million phones, a quarter of a billion dollars in past revenue, $600 million in future revenue. We're talking about a billion-dollar product. That is substantial market share. So I don't mean to denigrate 0.5%. It's only substantial market share as compared to what? And if the market is $35 billion, then it's really not substantial market share. It is substantial in the world of injunctions, Your Honor. Remember the substantiality... But when you look at the data and you look at the charts that are... And let's see, these are the charts that are at A1176. And right towards the end, at the end of the last quarter of 2011, we see an increase in sales of the smartphone. And we see the 4S still making upward trends. And then suddenly we see the iPhone just take off, almost off the chart. And we see a tapering off effect of the Samsung phone. I mean, how can you say that that's eroding your market share? Well, Your Honor... That's one question. And the other question before we get away is that assuming that there is market erosion, then where do you show or where do I find in the record that market share erosion is accounted for because of the infringing feature of the Nexus? So if I could answer that as well in two steps. First is the market share, there are obviously things going on, holidays and so forth in there. But if you look at the overall trend lines, and Dr. Velturo, our expert, testified to this, it is clear that Samsung, over time, has been gaining ground on Apple. And it is through the sale of this and other products. Then, as you looked directly at the Galaxy Nexus, the court spent a lot of time, detailed findings here on what drives the sales here. As I started to say earlier, there are three pieces of evidence. One is the circumstantial evidence from the Siri sales. And I would like to pause there because if we look at Apple I, remember the court affirmed the finding of irreparable harm as to the 889 design patent there. At the end of the opinion, a lot of what gets talked about at the beginning of the opinion where the court established the causal Nexus requirement, at the end of the opinion, the court applied it and said, design matters to tablet customers, not to Galaxy tablet customers or to iPad customers, but to tablet customers at large because this is head-to-head competition and so the customer demographic is the customers for tablets. And when the district court made a factual finding that design matters to that customer base, this court affirmed the causal Nexus finding. The court made the same finding here. Search matters to smartphone customers. Unified search matters to smartphone customers. And we know that from direct evidence of Apple's customers. But there's no showing. I mean, she says that it's a core feature. Just like I would imagine having a screen is a core feature of a smartphone or having an alarm or maybe that tells you of an incoming call. That's a core feature. So searching is a core feature. But you still haven't answered the question, and you're alleging that the Nexus phone has an infringing feature. Correct. All right. Okay. Well, show me or where do I find in the record that it's that infringing feature that drove these sales that allowed it to gain a 0.5 market share? Again, it's the theory evidence that is that search matters to smartphone customers. It's the Android developer's guide. And this is a document. Google developed Android and put this out to its developers. How do you sell products to these customers? You give them search capability because search is a core user feature. That's Google's words. And if you read through to the end of that same document, which it appears at A155 of the record, you will find that it says, please write your program's developers with this search capability to use it as a plug-in module, precisely as described in this patent, so that you can sell more of these things to these customers because they like to be able to search the things on their phone. And third is we have expert testimony that explain. We have both Dr. Belturo to explain the dynamics of the market and why search matters, and Dr. Polish who explained the technology and who explained in his deposition. There's nothing that shows that customers are buying the Nexus because of the infringing feature. That's not true, Your Honor. I don't agree with that. Well, you keep saying it matters. It matters. You've used that word four times in the past two minutes. Is that the same as driving demand? It is, Your Honor. The court made a finding or a determination. Well, first, I'm quoting from Apple I is the reason I'm saying that. Design matters is a direct quote from page 1328 of the Apple I decision that was the basis of the causal Nexus determination there as to the 889 design patent. But more importantly, when this court said drives demand, that that can be shown in two ways. You can either show that it affirmatively drives the demand, people go out and seek it, or that it negatively drives demand. That is, the absence of the feature would lessen consumer demand. Samsung doesn't challenge that legal standard on appeal because I think it's clearly correct, and the district court said both were true here. We know from the Siri evidence that people affirmatively seek out unified search capabilities in phones. Can you remind me, what is the Siri evidence that shows that people are looking for unified search as opposed from people just like Siri? Well, they talk about Siri in general, and then they talk about what they like about Siri. When you drill down to the next question in that survey, it's that it produces results. And Dr. Polish in his deposition explains that that's the unified search. Where is that evidence? Show me that. Your Honor, that is at... The evidence of why they like Siri. Yes, it is A83 at the bottom where the court is quoting the Veltura reply declaration. 61% of the users report using Siri to find information, and 30% to find a contact. No, but find information. I use Siri to find information via voice recognition. I love it. It's awesome. So where is the evidence that shows it's the search, the unified search feature? Yes, Your Honor, and that's also at page A83. Just above that, when she is quoting, excuse me, Judge Koh is quoting Dr. Polish's deposition at A909 when he explains the comprehensiveness of search results is what drives... A83. I just want to try and get with you. Which line? Your Honor, it starts at page line 18, as Apple's experts stated during his deposition. Right, a lot of Siri's value comes from its comprehensiveness, and the claim features of 604 are important to achieving that comprehensiveness. Yes, Your Honor. That doesn't answer Judge Moore's question, though. I mean, she's asking where does it say that it's a search feature, not the Siri feature, the voice? Well, with respect, Your Honor, that's exactly what he's talking about. It's not the voice, it's the comprehensiveness that people like and what allows that comprehensiveness is the patented feature. It allows it to go out to multiple areas, not just one, and that was the invention. Can I turn you quickly, before your time runs out, to the claim construction question? Surely. I don't have it, I can't find it in front of me, but my recollection is, so correct me if I'm wrong, that the district court, in doing her claim construction, referenced the prosecution history, saying it supported your position, but didn't really cite to what prosecution history she was talking about. Am I right about that? She referred to that same part of the file history where the distinction of Andreoli was made, I believe, Your Honor. And so what helps you on this prosecution history? Because I think the sentence, and I think this was raised in the earlier argument with your friend, is it seems to me this goes quite in the direction of supporting the position they're taking on claim construction, right? I'm looking at A1403. Her point, and our point, is the Andreoli reference was distinguished because he was using a constraint parameter search, not a heuristic search, and he used it in two ways. And when the applicant distinguished it there, they're distinguishing the type of searches being made. It has nothing to do with this question of each. And if I could just directly answer to each question, I think I can make it very simple. Can you just tell me what about this quote that I'm looking at, that supports the statement you just made? Yes, Your Honor. If you look at the very top of A1403, Andreoli teaches that the processor can use the solution to a constraint satisfaction algorithm to formulate a search request and employ any appropriate combination of local and remote search operations. Andreoli does not describe that each of those search operations, that is, the local and remote search operations just described about, employs a different heuristic algorithm, but the emphasis there is on heuristic because what he teaches is constraint satisfaction. Well, how do we know that? I mean, employs a different. Why can't we put the emphasis on different? That's what the claim language talks about. And we have no objection to that, so let me just go straight to the claim language. Everyone agrees, and I think there's some confusion here. Each heuristic algorithm must be different. We agree with that, they agree with that, Judge Koh agrees with that. The question is, each heuristic algorithm, of what subset of heuristic algorithms? The Samsung position is, every heuristic algorithm in the device, that's page 4 of their brief, or in the apparatus, that's page 35 of their brief. Our position is, each heuristic algorithm in a plurality of heuristic algorithms, that's the limitation of Claim 6. That's the difference between the parties. But why isn't the plurality of heuristic algorithms, or heuristic modules, I'm sorry, why isn't the plurality of heuristic modules all of the heuristic modules? Because, Your Honor, this is a comprising claim, not a consist-of claim. If you look at the end of the preamble, it's a comprising claim. Yes, of course it's a comprising claim, but the language of the claim itself is a plurality of heuristic modules, which means two or more, that's a plurality. And so if the invention has ten heuristic modules in it, why aren't all ten of them the plurality of heuristic modules? Because in the infringement analysis, Your Honor, we only need to show the minimum that if it has two, that is a plurality that have different heuristics, it infringes this patent. You don't ever get to the third one. It doesn't matter for infringement purposes. And that's because the word comprising is used? No, Your Honor, there's two different things there. The limitation is a plurality wherein each does these things. So the infringement happens once you get to two. And the reason that you don't look at the entire apparatus, which was, I believe, Judge Moore's first question, if I understood it correctly, is that it's an apparatus claim, but it's a comprising transition, therefore this is an included but not limited to. You can have more than one plurality. And, of course, the spec actually discloses multiple plurality implementations of the invention. With different heuristic modules? Your Honor, it doesn't say anything about what heuristics are being used. And there's a finite number of heuristics and an infinite number of modules, so common sense tells us that you could always repeat it. Nothing in the spec or the claim limits it in that way. It only is two or more that have different heuristics, the 604 patent claims, and it's undisputed that that's what this device does. Well, not surprisingly, you've managed to use up your time and more. I appreciate the court's indulgence, Your Honor. A little a minute over, so to even things out, if you need it, Mr. Quinn, you're up to four minutes now. Okay. A rebuttal time. Thank you, Your Honors. I think my friend was arguing about the record and arguing for a position that we should compare market share as to a specific Apple phone and the Nexus Galaxy. There is no information in the record about the relative market share as to any specific Apple phone and the Galaxy, and that was not the basis on which the court made any of the decisions. To answer some of the questions, Apple smartphone's market share first quarter of 2012 was 45%. The court can see that from A1174 to 1178. In fact, Apple's market share in each quarter is collected in the record at A1568. As I said, there is no evidence concerning relative market shares of specific Samsung and Apple phones. What about on 1176? You see share of U.S. smartphone revenue, Apple and Samsung. You refer specifically to the iPhone 4S and the Galaxy Nexus. It seems to me that that could constitute evidence of, at minimum, some market erosion. My point was, Your Honor, it doesn't really give us market share data for those particular phones, but I listened to counsel, and I take it now there isn't really a dispute that the maximum market share for this phone was 0.5%. There is no other evidence in the record. We're talking about minuscule sales. We're talking about in the fourth quarter of 2011, the first quarter of 2012 of a grand total of $250 million in sales for the Nexus. Well, he doesn't agree with your definition of market. That's what he's saying. He's saying 0.5% is, sure, that's the market for all cell phones, but these two phones are competing only against each other, and people are going to buy one or the other of them, so the market should be limited to those two phones, and within the market for those two phones, it's 25%. That does seem like a substantial market share to me. I may be wrong, but that's what I understand the argument to be. I don't think there is any evidence at all that these two phones are only competing against each other. To the contrary, I think the evidence is that people make a fundamental decision whether they want to buy an Android phone or whether they want to buy an iPhone. People who are willing to buy the Galaxy Nexus and looking for all those features and willing to spend that amount of money are not going to go to the lowest level flip phone that still exists on the market. So to say that's part of the relevant market seems quite frankly irrelevant to me. I mean, there has to be a reasonable market that you're looking for. No, quite right, Your Honor. I'm not sure all phones is the right market. I'm not talking about all phones. I'm talking about smartphones. In the total market per year, $105 million is the evidence before the court that the iPhone in the fourth quarter alone, iPhone sold $9.35 billion, $9.35 billion versus Nexus sales in two quarters of $250 million. But doesn't the stickiness nature of the sales also account for market share? Well, except the stickiness. What that means is you have new entrants coming into the market, new buyers, and let's accept by hypothesis that if you buy an Android phone, you're more likely to buy an Android phone, and that will be harder for Apple to… Or also that you're more likely to stay with an Android once you have one. Exactly. So your market and the data show that you're increasing in your market of sales. I know you can measure market share in many ways, domestic shipments, domestic consumption, production numbers, but one of the best ways is by sales. Sure, and I think these are the numbers we're working with, but what does that tell us, the stickiness and this phenomenon that new buyers are coming into the market? Fine, the market's going to expand, but what reason do we have, what evidence in the record is it that can be pointed to that suggests that these new smartphone purchasers are likely to buy Nexuses at a higher rate than 0.5%? There's nothing. The market may expand, but there's no reason to think that that minuscule market share is going to go up. There's simply nothing in the record on that. And that's the last word. Can I have the last word? Sure, absolutely. Well, my last word, it's not really directed to either of you. It's something that we actually talked about beforehand, which is I'll say that I think the oral argument by both sides is excellent. I think the briefing in general is excellent with a huge exception, and the huge exception is, okay, precipitous judicial intervention, thermonuclear dimension, ubiquitous patent litigation, threatening markets, discreet and incidental patent infringement, making collateral casualties of consumer choice and natural market competition, and that's all in a single sentence in the first page of the Blue Brief. Did we write that? You wrote that. So it was, the sentence spans half the page, and it has got something like 18 adjectives and adverbs in it. That's a little bit of an exaggeration. But it's just, it isn't helpful. So I'll tell you, when I read the first page of your brief, I closed it and turned to theirs, because I thought, all this mudslinging and rhetoric, I don't want to read it. Problem was, sentence number one in the red brief, systematically copied Apple's innovative technology deluding markets with infringing devices in a relentless effort to steal customers' and usurp market share. Oh, my goodness, I went back to the Blue Brief for that part and thought I'd give you a fair shot since you both did it. But it doesn't help. Your briefs are really good, and when I got into it, I really liked it. I don't know who drives the mudslinging, whether it's the lawyers or the client, but in any event, it turns off the judges. So I would, for whatever it's worth, I would tell you, you both did a great job apart from that, and I'd like to see less of it in the future. Thank you. We've got some things to learn still. Thank you. And on that, the case is submitted. We thank both parties, and the evidence was very helpful. We thank you both. The case is submitted. All rise.